IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>    Chapter 13<br>DONALD F. BLIZZARD, Jr.,<br><br>        Debtor. | Case No.: 23-12669-AMC |
| P&I INSURANCE SERVICES, LLC,<br><br>        Plaintiff<br>vs.<br>DONALD F. BLIZZARD, Jr.,<br><br>        Defendant. | Adv. No.: 24- |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

Plaintiff, P&I Insurance Services, LLC ("P&I" or "Plaintiff"), by and through its undersigned counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby files this Complaint to determine the dischargeability of certain debt obligations owed to the Plaintiff by Donald F. Blizzard, Jr., pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4) and/or 11 U.S.C. § 523(a)(6), arising from the Debtor's violations of the terms of a certain Producer Agreement (defined below) and other actions violative of his fiduciary and duties of loyalty to P&I and alleges as follows upon information and belief, based on its investigation of the matters alleged:

**I. JURISDICTION AND VENUE**

1. This adversary proceeding is a core proceeding pursuant to § 157(b) of Title 28 of the United States Code. This Court has jurisdiction pursuant to § 157 and § 1334(b) of Title 28 of the United States Code, and the General Order of Reference of the United States District Court for the Eastern District of Pennsylvania.

2. This adversary proceeding arises in a case under the Bankruptcy Code pending in this District and, thus, venue properly lies within this District pursuant to § 1409(a) of Title 28 of the United States Code.

3. This is an adversary proceeding brought under and pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and §§ 105, 523 and 132 and of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code").

4. This adversary proceeding arises under and in connection with the above-captioned Chapter 13 bankruptcy case.

## II. THE PARTIES

5. Plaintiff, P&I, is a Pennsylvania limited liability company and a licensed insurance broker and has been engaged in the sales, service, procurement of insurance and risk management advisory services since 2008 with a business address of 1489 Baltimore Pike, Suite 201, Springfield, PA 19064.

6. Donald F. Blizzard, Jr., (the "Debtor" or "Defendant") is an adult individual who is the debtor in the above-captioned Chapter 13 bankruptcy case pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania with a principal residence at 1138 Putnam Boulevard, Wallingford, PA 19086.

## III. INTRODUCTION

7. Defendant worked for P&I as an insurance producer beginning in the fall of 2009 until the termination of his employment on January 17, 2019. Prior to and following the termination of his employment with P&I, Defendant misappropriated confidential client and trade information to divert P&I clients for his own benefit and that of his subsequent employer. This nondischargeability

complaint arises out of an arbitration action by P&I against the Defendant for violations of certain restrictive covenants, confidentiality and non-disclosure obligations set forth in a certain Producer Agreement as well as violations of fiduciary duties and duties of loyalty committed by the Defendant prior to and following his employment with P&I. As will be described in detail below, after a multiday arbitration hearing, P&I was awarded the sum of $1,612,110.00 for lost profits and exemplary damages. This arbitration award was subsequently confirmed by the District Court for the Eastern District of Pennsylvania. The judgment has been transferred and recorded as a foreign judgment in both New Jersey and in the Court of Common Pleas, Delaware County, Pennsylvania. The Superior Court of New Jersey then entered a Charging Order imposing a lien in favor of P&I on distributions on Defendant's membership interests Global InterXchange LLC. Defendant filed this chapter 13 bankruptcy proceeding shortly after the entry of the Charging Order.

### III.  FACTS UNDERLYING THE CLAIM

8. Defendant worked for P&I as an insurance producer beginning in November 2009 through his termination of employment on or about January 17, 2019. "Producers" are employees who are licensed to sell insurance and must hold a producer license for the line of policies that they sell, such as casualty or property insurance.

9. On or about January 3, 2011, Defendant and P&I executed a document entitled "P&I Insurance Services, LLC — Producer Agreement" ("Producer Agreement"), in exchange for Defendant's right to receive a split of commissions which he was previously ineligible to receive. A true and correct copy of the Producer Agreement is made a part hereof and is attached hereto as Exhibit "A".

10. After signing the Producer Agreement, Defendant became eligible to receive, and did receive, a much greater income than he was previously being paid.

11. As an employee of P&I, Defendant had access to P&I's valuable confidential, proprietary and trade secret information and was under a duty to keep such information confidential during and after his employment. Among other items, such information included the identity of P&I's clients, the clients' financial information, and details of their policies such as renewal dates and premiums. Such information also included P&I's marketing plans. As a producer, Defendant had a high level of interaction with P&I's clients and potential clients.

12. The Producer Agreement imposed confidentiality and non-disclosure obligations on Defendant as well as restricted Defendant's post-employment activities. These restrictive covenants included prohibiting Defendant from notifying or allowing notice to any of his commission accounts that he is no longer affiliated with P&I or affiliated with a direct or indirect competitor for a period of 36 months after termination of the Producer Agreement; prohibiting Defendant from soliciting or sharing any information regarding P&I's accounts with any other person or firm for a period of 36 months after termination of the Producer Agreement; prohibiting Defendant from directly or indirectly soliciting any of P&I's past, present or future clients that were then under solicitation by P&I for a period of three years after termination of the Producer Agreement; and prohibiting Defendant from divulging, disclosing or communicating to any third party, without P&I's written consent, P&I's proprietary and confidential information, including customer lists, business affairs, process information, procedures, forms and records, organizational files and all aspects of P&I's business which constitute confidential and business information for a period of ten years after termination of the Producer Agreement. See, Exhibit A, Producer Agreement.

13. In late March 2018, a long simmering dispute between Defendant and other P&I personnel erupted into a hostile meeting that involved swearing and name calling. Defendant left the meeting angry and upset.

14. Following the meeting, Defendant decided that he would leave P&I and join a competing insurance agency.

15. By early April, Defendant was communicating with William Sprague ("Sprague"), a principal of Risk Averse Insurance ("Risk Averse"), which is a direct competitor of P&I, regarding the possibility of leaving P&I and joining Risk Averse as a producer. Defendant thereafter met with Sprague and another principal of Risk Averse to discuss his plans to leave P&I.

16. By May 2018, Defendant began referring potential and existing P&I clients to Risk Averse in contravention of the Producer Agreement, Defendant's fiduciary obligations and P&I policies.

17. In July 2018, P&I's principal organized an informal mediation between the parties to the long-running dispute to try to restore peace and productivity in the office. Defendant, P&I's principal, another P&I team member involved in the dispute, and a mediator met to discuss the issue. Leading up to, during the meeting and shortly after the meeting, Defendant made various representations to P&I's principal that Defendant intended to continue working at P&I in the future and would use his best efforts to continue to procure insurance business on P&I's behalf. For example, during this time, Defendant represented that he was "in it (referring to employment with P&I) for the long term." P&I also offered to increase his commissions on certain accounts in exchange for his ongoing commitment to P&I. In response, Blizzard indicated that P&I's principal should "sit back and watch" him procure new accounts for P&I's benefit.

18. In September and November 2018, Defendant continued to emphasize to P&I's principal that he intended to use his best efforts to procure insurance business for P&I, at one point indicating that being a P&I producer will always be his "primary" occupation, as distinguished from operating a separate business owned by Defendant and a partner.

19. At the time Defendant made these representations, he knew them to be false but made them anyway because he had yet to secure alternative employment. He also requested and received a change in commission structure that resulted in him receiving additional compensation.

20. In December 2018, P&I learned that Defendant had made an error on an account creating the potential for significant liability for P&I. Defendant was placed on paid leave and directed not to seek new business or interact with P&I clients or prospects. Defendant acknowledged these limitations and represented that he would abide by them.

21. When Defendant confirmed to P&I's principal that he would not perform work on P&I's clients' or prospective clients' accounts, he knew those statements were false.

22. In December 2018, Defendant explicitly confirmed with Sprague that he intended to leave P&I and work for Risk Averse.

23. While still employed by P&I, and contrary to Defendant's confirmation that he would not perform work on P&I clients' and prospective clients' accounts, Defendant began referring prospective and existing P&I clients to Risk Averse. He also began providing Sprague with P&I's confidential trade secret information, including P&I's customer information, information on customer policies, premium amounts and renewal dates. He accessed P&I's systems to take information that he could, and did, pass to Sprague to facilitate the transfer of a large P&I client.

24. On January 17, 2019, P&I terminated Defendant's employment.

25. Within a matter of days after termination, P&I learned that Defendant was working for Risk Averse in a substantially similar position as he had with P&I and was actively contacting P&I's clients through the business networking service known as LinkedIn.

26. P&I also learned that, prior to being terminated, Defendant had clandestinely and without P&I's knowledge or authorization produced and/or downloaded a report containing a list of P&I's clients and detailed information regarding their policies, policy renewal dates, contact information and the identity of their insurers, which data was gathered from P&I's confidential and proprietary information and trade secrets shared with Defendant in the course of performing his job on behalf of P&I.

27. After termination of Defendant's employment with P&I, Defendant continued to actively solicit P&I's clients on behalf of Risk Averse in violation of his Producer Agreement and by using confidential and proprietary information and trade secrets of P&I without authorization.

28. After termination of his employment, Defendant refused to return his company laptop and phone despite P&I's demands that he do so. Upon information and belief, the company laptop contained or contains P&I's confidential and proprietary information and trade secrets.

29. Within two months following Defendant's termination, there were more than forty (40) notices of cancellation and/or broker of record changes for policies written for P&I's clients, all of which had a relationship with Defendant while he was employed by P&I.

30. Defendant's actions violated his contractual and fiduciary obligations to P&I before and after termination of employment.

31. As continuing changes to the broker of record designation occurred on P&I's clients' policies, it became clear that Defendant and Risk Averse were utilizing the trade secret information Defendant misappropriated from P&I for their own benefit.

32. To facilitate the solicitation of P&I's customers, Risk Averse became for the first time a designated agent of at least one insurance company that had issued policies to many of P&I's clients. This designation allowed Defendant and Risk Averse to collect commissions on policies issued to such clients without the need for the client to switch carriers.

33. Defendant engaged in a pattern of contacting P&I's clients who had upcoming policy renewal dates and requesting that they either cancel their policy and obtain a new policy through Risk Averse or sign a document that would change the broker of record from P&I to Risk Averse.

34. By often contacting customers on a date that was close to an upcoming renewal and based on Defendant's past relationship as agent for these customers while employed with P&I, Defendant was able to reduce the chance that a client would think a call or email from their insurance agent was suspicious in some way.

35. Defendant's actions led to the switching over of more than 100 policies from P&I to Risk Averse in less than a two-year period after Defendant's termination.

36. On November 24, 2020, P&I initiated an action against Risk Averse in federal district court for the Eastern District of Pennsylvania ("Risk Averse Litigation").

37. Defendant was not named as a party in the Risk Averse Litigaiton but, given that the action was based on his misconduct, he was served with written discovery requests and was required to appear for a deposition. Defendant ignored P&I's discovery requests, necessitating multiple rounds of motions practice and resulting in court orders against Defendant.

38. In early January 2022, P&I and Risk Averse were engaged in settlement discussions with respect to the Risk Averse Litigation.

39. On or about January 10, 2022, Defendant participated in discussions regarding settlement of the Risk Averse Litigation. During those discussions, P&I offered to release Defendant from liability in exchange for, among other things, the transfer of Defendant's 100,000 membership interest units ("Blizzard Interest") of Global InterXchange LLC ("GIX").

40. GIX is a telecommunications start up engaged in the construction and leasing of fiber optic cable between New Jersey and lower Manhattan. The Blizzard Interest is believed to be Defendant's primary asset.

41. Defendant refused to transfer the Blizzard Interest in connection with the settlement of the Risk Averse Litigation.

42. P&I and Risk Averse continued settlement discussions without Defendant's participation and P&I revised its demands to include an exclusion in the applicable release that would allow P&I to pursue Defendant after it settled with Risk Averse.

43. On or about January 11, 2022, Defendant learned about P&I's proposal to exclude him from any release and its intention to pursue him individually.

44. On or about January 12, 2022, Defendant contacted GIX's managers and requested that they approve the transfer of the Blizzard Interest to a family member or other Defendant affiliate.

45. On or about January 24, 2022, P&I commenced AAA arbitration action 01-22-0000-3380 (the "Arbitration Action") against Defendant for Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, et seq.); Violation of the Pennsylvania Uniform Trade Secrets Act (12 Pa. C.S. § 5301, et seq.); Breach of Contract; Tortious Interference; Unfair Competition; and Unjust

Enrichment. A true and correct copy of the First Amended Arbitration Complaint ("<u>Arbitration Action Complaint</u>") is made a part hereof and is attached hereto as Exhibit "B".

46. P&I filed Claimant's Application for Emergency Measures of Protection Pursuant to Commercial Rule 37 & 38 in the Arbitration Action seeking to enjoin Defendant from dissipating the Blizzard Interest.

47. On February 14, 2022, after a hearing, the arbitrator issued an order prohibiting Defendant from "transferring, selling, assigning or hypothecating his membership interest in GIX to any person, entity, trust or other party during the pendency of [the] Arbitration without prior approval of the Arbitrator."

48. Following entry of the arbitrator's emergency order, the arbitration proceeded to its conclusion.

49. After a multiday evidentiary hearing, the arbitrator, on November 10, 2022, found in favor of P&I on all five counts of the Arbitration Action Complaint and awarded P&I lost profits in the amount of $537,370.00, plus exemplary damages in the amount of $1,074,740.00, totaling $1,612,110.00 (the "<u>Arbitration Award</u>"). A true and correct copy of the Arbitration Award is made a part hereof and is attached hereto as Exhibit "C".

50. On March 9, 2023, in response to P&I's Petition to Confirm Arbitration Award, the United States District Court for the Eastern District of Pennsylvania (Misc. Action 2:23-mc-0031-NIQA) entered an Order of Judgment in the amount of One Million, Six Hundred Twelve Thousand, One Hundred and Ten Dollars ($1,612,110.00) in favor of P&I and against Defendant (the "<u>EDPA Judgment</u>"). A true and correct copy of the EDPA Judgment is made a part hereof and is attached hereto as Exhibit "D".

51. P&I then transferred and recorded the EDPA Judgment as a foreign judgment in both New Jersey and in the Court of Common Pleas, Delaware County, Pennsylvania. (collectively, with the EDPA Judgment, the "Judgment").

52. In response to the application of P&I, the Superior Court of New Jersey, Civil Division, Mercer County (MER-DJ-050181-23) on July 21, 2023, entered an Order Charging Defendant's Interests in Global InterXchange (the "Charging Order"). A true and correct copy of the Charging Order is made a part hereof and is attached hereto as Exhibit "E".

53. The Charging Order found that P&I holds an enforceable judgment in the amount of $1,612,110.00 which had not been satisfied and that Defendant holds an interest in GIX and ordered that:

> (a) Defendant's interest in GIX is charged with a lien until the Judgment has been satisfied in full;
>
> (b) All distributions made by GIX to Defendant's interest in GIX shall instead be paid to P&I, through its attorneys;
>
> (c) Defendant is prohibited from receiving any other money or assets from GIX; and
>
> (d) Defendant must remit to P&I any moneys or assets received from GIX as well provide P&I with copies of any financial information (e.g. financial statements, notification of distributions, Form K-1) received from GIX.

54. To date, the Judgment remains unpaid.

55. Debtor filed his Chapter 13 petition on September 7, 2023 ("Petition Date"), a mere 42 days after the entry of the Charging Order.

## IV. RESERVATION OF RIGHTS AND NO WAIVER

56. P&I's investigation into the transactions of the Defendant continues, and it reserves the right to amend this Complaint as facts later become known through discovery or for any other reason.

57. The filing of this adversary proceeding is not (a) an election of remedies; (b) a waiver or release of P&I's rights against any person, entity or property including claims against the Defendant through any Plan; (c) a waiver of the right to move or withdraw the reference or otherwise to challenge the jurisdiction of this reference or otherwise challenge the jurisdiction of the bankruptcy court; (d) a waiver of any rights or claims P&I has against the Defendant or any person or entity with respect to any pending or future litigation or to any matters related to such litigation; (e) a waiver of past, present or future copyright infringement claims against the Defendant or others; or (f) a waiver of any of P&I's rights in the Defendant's bankruptcy case, including the right to oppose confirmation of any Plan filed by the Defendant.

### COUNT I
### NONDISCHARGEABILITY OF DEBT
### 11 U.S.C. § 523(a)(2)(A)

58. P&I incorporates the preceding paragraphs by reference as if set forth fully herein and at length.

59. Bankruptcy Code § 1328, in relevant part, excepts from discharge debts provided for in a plan of the kind specified in 11 U.S.C. § 523(a)(2) and (a)(4).

60. Bankruptcy Code § 523(a)(2)(A) provides, in relevant part, that a discharge under section 1328(b) does not discharge an individual debtor from "any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

61. While subject to the Producer Agreement, Defendant misappropriated P&I's assets in the form of money and intellectual property, and other protected trade secrets as set forth in greater detail above, through false pretenses, false representations and/or actual fraud.

62. In addition, Defendant made false and misleading statements to P&I by concealing his intention and actions to misappropriate confidential client and trade secret information to divert P&I clients for his own benefit and that of his subsequent employer.

63. Defendant contacted P&I's clients for the purpose of soliciting their business for his personal benefit and that of Risk Averse while knowing that he was prohibited from doing so under the Producer Agreement.

64. P&I reasonably and justifiably relied on the false and misleading representations made by Defendant during his employment and permitted access to confidential client and trade secret information.

65. Defendant made the false and misleading representations to P&I knowing them to be false and with the intent and purpose of deceiving P&I.

66. Defendant obtained property from P&I through false pretenses, false representations and/or actual fraud.

67. Defendant directly benefited from P&I and the assets he misappropriated from P&I in order to further his own career in violation of the Producer Agreement.

68. P&I has suffered damages, including the damages awarded in the Judgment, as a direct result of the Defendant's false pretenses, false representations and/or actual fraud.

69. The Judgment amount should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, P&I prays this Honorable Court enter a nondischargeable judgment against the Defendant including interest, attorney fees and costs, and for any such further relief as the Court may deem appropriate.

## COUNT II
## NONDISCHARGEABILITY OF DEBT
## 11 U.S.C. § 523(a)(4)

70. P&I incorporates the preceding paragraphs by reference as if set forth fully herein and at length.

71. Bankruptcy Code § 523(a)(4) prohibits the discharge of a debtor when there is "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." 11 U.S.C. § 523(a)(4).

72. Defendant was a fiduciary of P&I, having been entrusted with confidential client and trade secret information pursuant to the Producer Agreement.

73. Defendant engaged in fraud while acting in a fiduciary capacity.

74. Defendant committed larceny by misappropriating confidential client and trade secret information of P&I and diverting commission revenue of P&I's clients.

75. The Judgment amount should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

WHEREFORE, P&I prays this Honorable Court enter a nondischargeable judgment against the Defendant including interest, attorney fees and costs, and for any such further relief as the Court may deem appropriate.

## COUNT III
## NONDISCHARGEABILITY OF DEBT
## 11 U.S.C. § 523(a)(6)

76. P&I incorporates the preceding paragraphs by reference as if set forth fully herein and at length.

77. Bankruptcy Code § 1328(c) provides that a "hardship discharge" granted under 11 U.S.C. § 1328(b) excepts from discharge any debt of a kind specified in 11 U.S.C. § 532(a).

78. To the extent that Defendant seeks a hardship discharge pursuant to 11 U.S.C. § 1328(b) and (c), P&I asserts that the Judgment amount is not subject to discharge pursuant to 11 U.S.C. § 523(a)(6).

79. Bankruptcy Code § 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

80. Defendant's actions described above were necessarily willful and malicious, as Defendant intentionally and deliberately took action that was substantially certain to cause damages to P&I and did cause damages to P&I. These actions include, but are not limited to, misappropriating confidential client and trade secret information, the unauthorized use of that information to solicit P&I's clients and the diversion of commission revenue to Risk Averse.

81. The arbitrator in the Arbitration Award made a finding that "Blizzard intentionally took P&I's customer information and delivered it to a competitor some of it while still working for P&I. Nothing about Blizzard's conduct was innocent. In fact, the testimony and evidence demonstrated Blizzard's conduct was spiteful." See Exhibit C, Arbitration Award. Further, the arbitrator found that Defendant's misappropriation of P&I's trade secrets was willful and malicious. Id. As a consequence of Defendant' willful and malicious theft of P&I's trade secrets, breach of his employment agreement and tortious interference with P&I's customer relationships, P&I has suffered damages as reflected in the Judgment.

82. Defendant's willful and malicious actions caused P&I harm in the loss of clients, the loss of business potential, the loss of property in the form of money and the devaluing of its trade secrets.

83. Defendant's willful and malicious actions were intended to cause harm to P&I.

84. Defendant's willful and malicious actions were wrongful and were done without just cause or excuse.

85. P&I sustained damage as the proximate cause of the willful and malicious actions of the Defendant in an amount not less than the Judgment.

86. The aforementioned damages should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

WHEREFORE, P&I prays this Honorable Court enter a nondischargeable judgment against the Defendant including interest, attorney fees and costs, and for any such further relief as the Court may deem appropriate.

Respectfully submitted,

Dated: July 1, 2024

By: /s/ D. Alexander Barnes
D. Alexander Barnes, Esq.
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Telephone: (215) 665-3184
Facsimile: (215) 665-3165
Email: alexander.barnes@obermayer.com

-and-

Edward S. Robson, Esquire, I.D. 307381
ROBSON & ROBSON P.C.
2200 Renaissance Boulevard, Suite 270
King of Prussia, PA 19406
Telephone: (610) 825-3009
Facsimile: (610) 825-2620
Email: erobson@robsonlaw.com

*Counsel to Plaintiff, P&I Insurance Services, LLC*